UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MESHA DENISE HODGE,

       Plaintiff,                               Civil Action No. 12-11695

v.                                     HON. NANCY G. EDMUNDS
                                     U.S. District Judge
                                     HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Mesha Denise Hodge brings this action under 42 U.S.C. §405(g)

challenging a final decision of Defendant Commissioner denying her application for

Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have

filed summary judgment motions which have been referred for a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I

recommend that Defendant's Motion for Summary Judgment be GRANTED, and that

Plaintiff's Motion for Summary Judgment be DENIED.

**PROCEDURAL HISTORY**

On June 7, 2009, Plaintiff filed an application for SSI and DIB alleging disability

as of June 10, 2007 (Tr. 117).  After the initial denial of her claim, Plaintiff requested an

administrative hearing, held August 12, 2010 before Administrative Law Judge ("ALJ")

Theodore W. Grippo (Tr. 39).  Plaintiff, represented by attorney Steven Harthorn, testified in person, as did vocational expert ("VE") Diane Regan (Tr. 39).  On December 22, 2010, ALJ Theodore W. Grippo found that Plaintiff was not disabled (Tr. 16).  On March 20, 2012, the Appeals council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the administrative decision on April 14, 2012.

## BACKGROUND FACTS

Plaintiff, born October 21, 1971, was 38 when the ALJ issued his decision (Tr. 113).  She completed eleventh grade but later earned her GED and Certified Nursing Assistant and home health care aid vocational certifications (Tr. 40, 153).  She worked previously as a nursing assistant at assisted living facilities, a home health care aid, a mail sorter at the post office, and worked at a pizza restaurant (Tr. 155).  She alleges disability as a result of back injury, sciatica, vertigo, depression, and anxiety (Tr. 146).

### A.    Plaintiff's Testimony

Plaintiff testified about her educational and work history, how she became allegedly disabled, and about her symptoms and capabilities in light of her alleged disability:[1]

Plaintiff dropped out of high school after eleventh grade because she had a child, but later earned her GED and vocational certifications in 1995 or 1996 (Tr. 40). She previously received SSI benefits for depression and at one point was hospitalized in an

---

[1] Plaintiff's testimony is described in narrative format for ease of reading.  This section does not represent findings of fact.

inpatient facility for her depression (Tr. 41). She mainly worked in home health care because she didn't deal well with crowds of people (Tr. 41). She also worked at Little Caesars, in an assisted living facility, at the Post Office for a short time, and she worked doing cleaning (Tr. 41-42).

Plaintiff allegedly became disabled while working as a nursing assistant (Tr. 42). On June 10, 2007 she was lifting a patient to put him into his wheelchair for a shower when she injured her back (Tr. 42). She had not worked since that day because she was in constant pain, she would fall, she had lumps and bruises, her spine was crooked, and she had constant spasms (Tr. 42). She was also depressed (Tr. 42).

Plaintiff saw several doctors and was referred to a surgeon, Dr. Claybrooks (Tr. 42-43). He told her that she was not a candidate for surgery because "there was nothing to fuse." (Tr. 43). She was referred to a neurologist, Dr. Tessy Jenkins, whom Plaintiff continued to see through the time of the hearing (Tr. 43). Dr. Jenkins told her that she was not going to get better, and the only thing the doctor could do was try to make her comfortable with medication because this was a degenerative condition (Tr. 43). Dr. Jenkins also gave her medication for depression (Tr. 43).

Plaintiff was treated in the past by Dr. Laran J. Lerner, D.O., who told her that there was nothing he could do but keep her in physical therapy in order to prevent her back from stiffening (Tr. 44). However, she stopped treating with Dr. Lerner because of an insurance issue (Tr. 44). Dr. Lerner prescribed a walker, a cane, and a back brace that was made for her (Tr. 44). In addition to her back trouble, she had trouble with her left

shoulder because it was difficult to lift her arm (Tr. 45). She is left handed (Tr. 45). She was told that it was tendinitis or frozen shoulder and she would need to be anesthetized to have it fixed (Tr. 45).

Plaintiff also had issues from falling due to back spasms (Tr. 45). The spasms would start with her back, shoot down to her legs and feet, and then her feet would turn in and she would fall (Tr. 45). Her left leg was stronger, but she had more problems with her right leg because her spasms occurred on the right side (Tr. 45-46). In late 2007, Dr. Jenkins told her she had "drop foot" in her left leg (Tr. 45-46).

Plaintiff was seeing a therapist at Horizon for her depression (Tr. 46). She took several medications, including Valium, Lorset, Prozac, and a stool softener (Tr. 46-47). The medications "make it not as bad" but also they "don't help," and the medications made her tired and drowsy (Tr. 47). She had to take her medications before pain started or they wouldn't work at all, as the spasms would be unbearable and her body would lock up (Tr. 48).

In an ordinary day, she would wake up at 6:00 a.m., when her daughter would help her get to the bathroom and take her medications (Tr. 47). Plaintiff laid down just about all day, but she did home range of motion exercises recommended by Dr. Lerner (Tr. 48). Her activities during the day were limited to sleeping and watching television (Tr. 48). Prior to having these problems, she could shop with her four girls, she could go to the movies, and she was able to spend time with her older two grandchildren (Tr. 49).

Plaintiff lived in a ranch style home because she was unable to go up and down

stairs (Tr. 49). She lived with her two daughters, who helped her with bathing, getting

out of bed, using the bathroom, cooking, and washing clothes (Tr. 49). She was able to

shop as long as there was a motorized cart available (Tr. 49). Although she possessed a

driver's license, Plaintiff could only drive for ten or twenty minutes at most (Tr. 50).

Plaintiff could only lift about five or possibly ten pounds, and she wasn't able to

lift her grandchildren because of her spasms (Tr. 50). She believed she could sit for about

ten minutes and stand for about the same length of time (Tr. 50). She could walk about

20 feet and only with a cane or walker (Tr. 50). She needed assistance with showering

and bathing (Tr. 50). One of her daughters assisted her in the shower and another

daughter assisted her with meals, medication, grooming, and changing clothes (Tr. 51).

The state paid her second youngest daughter to clean her home (Tr. 51). She had

difficulties with concentration, public breakdowns, and emotional difficulties due to a

miscarriage the previous July when she was five months pregnant (Tr. 51-52). Therapy

did not improve her psychological symptoms (Tr. 52).

## B.    Medical Evidence

### 1.    Treating Sources

On June 10, 2007, Plaintiff sought emergency treatment at St. John Providence

Hospital after feeling an immediate discomfort in her lower back from lifting a patient

while employed at that hospital (Tr. 202). Plaintiff felt pain relief after receiving

Dilaudid and Valium, then signed out against medical advice (Tr. 199). The diagnosis

was acute lumbar radiculopathy (Tr. 204). She was prescribed Vicodin and Prilosec and was instructed to follow up with the hospital's Corporate Health department the next day (Tr. 204). The next day, she returned for further imaging studies of her spine (Tr. 198). A CT scan performed June 10, 2007 showed mild disk bulge at L4 and L5 and mild bulge with central disk herniation[2] at L5-S1, but no significant spinal canal stenosis[3] or neural foramina narrowing (Tr. 199). She was given Vicodin, Naproxen, and Prilosec for pain management (Tr. 198).

On June 16, 2007, Plaintiff again sought emergency treatment at St. John Providence Hospital for back pain from the same injury (Tr. 195). Another CT scan showed evidence of a bulging disc but no central canal stenosis (Tr. 195). She was prescribed Vicodin, Valium, and Ibuprofen, and discharged with instructions to follow up with the Corporate Health department the next Monday (Tr. 196).

On July 5, 2007, Plaintiff received an MRI on her lumbar spine (Tr. 214). The MRI showed broad-based disc herniation eccentric to the left with a degree of facet degenerative changes and biforaminal encroachment[4] at L4-L5 and L5-S1 (Tr. 215). The MRI also showed possible lateral disc herniation on the left side at L2-L3 and L3-L4,

---

[2] Extension of disc material into the spinal canal. *See* http://www.medilexicon.com/medicaldictionary.php?t=40621.

[3] A narrowing of the spinal foramen, the hole through which passes a spinal nerve as it exits the spine. *See* http://www.nervous-system-diseases.com/foraminal-stenosis.html

[4] Also known as Foraminal Stenosis; see note 2.

along with a degree of levoscoliosis[5] of the lumbar spine (Tr. 215).  Plaintiff was later

prescribed a cane in July 2007 (Tr. 220).

In August 2007, Plaintiff visited Botsford Hospital for emergency treatment,

complaining of muscle spasms from a drug reaction to Reglan[6] (Tr. 313).  She visited the

hospital earlier that day for muscle spasms, and was diagnosed with an adverse reaction

to Reglan (Tr. 314).  After she was released from the hospital the first time that day, she

was unable to find a pharmacy that was open, so her prescriptions for Vicodin and

Valium were not filled (Tr. 314).  After going home and going to sleep, she woke up with

more muscle spasms and returned to the hospital (Tr. 314).  She was given several

medications to treat the back pain, muscle spasms, and adverse reactions (Tr. 315).

Plaintiff was discharged with instructions to follow up with Peter L. Bono, D.O., and

William D. Boudouris, D.O. for further treatment (Tr. 318, 321).  Treating notes indicate

that Diane M. Paratore, D.O., observed that Plaintiff had these symptoms all along but

that perhaps  they were exacerbated by her medications (Tr. 318).

Plaintiff also received an MRI on August 20, 2007 on the cervical and thoracic

spine which showed normal results (Tr. 558).

In September 2007, Plaintiff visited neurologist Tessy Jenkins, M.D., complaining

---

[5] Curvature of the Spine to the left. *See*
http://www.medilexicon.com/medicaldictionary.php?t=80286; *see also*
http://www.spine-health.com/conditions/scoliosis/scoliosis-types.

[6] Reglan is commonly prescribed for relief of heartburn caused by
gastroesophageal reflux disease. *See* http://www.drugs.com/reglan.html.

of tremors, lower back pain and involuntary lumbar spasms (Tr. 216). Dr. Jenkins found

the lower back pain was likely due to degenerative sacroiliac disease,[7] damage to

thoracolumbar fascia,[8] sensory allodynia[9] due to recruitment of inflammatory mediators

and possibly a herniated nucleus pulposus[10] (Tr. 217). Dr. Jenkins also found

lumbosacral radiculopathy,[11] left L5 peroneal neuropathy, and that Plaintiff's involuntary

tremors and spasms were likely due to sympathetic effects of pain (Tr. 217). Dr. Jenkins

recommended that Plaintiff stop Ativan and start diazepam, take Vicodin ES and Soma

for pain, take Effexor XR for the neuropathic components of pain, and that Plaintiff

obtain a transcranial doppler ultrasound (Tr. 217). Dr. Jenkins also recommended

physical therapy (Tr. 218).

Plaintiff visited Laran Lerner, D.O., at Greater Detroit Physical Therapy &

Rehabilitation on September 28, 2007 (Tr. 435). Her diagnosis was lumbar myositis with

right and left sciatica, right and left hip bursitis, gait disturbance, and herniated lumbar

---

[7] High-impact trauma to the sacroiliac joint that can cause bone or nerve damage. *See* http://medical-dictionary.thefreedictionary.com/sacroiliac+disease.

[8] Fibrous tissue covering the deep muscles of the back. *See* http://medical-dictionary.thefreedictionary.com/thoracolumbar+fascia; *see also* http://medical-dictionary.thefreedictionary.com/fascia.

[9] Condition in which ordinarily nonpainful stimuli cause pain. *See* http://www.medilexicon.com/medicaldictionary.php?t=2339.

[10] Central fibrocartilaginous portion of an intervertebral disc. *See* http://medical-dictionary.thefreedictionary.com/nucleus+pulposus.

[11] Disorder of the spinal nerve roots. *See* http://www.medilexicon.com/medicaldictionary.php?t=74865.

disc (Tr. 435).  Dr. Lerner wrote Plaintiff a work disability note stating that she was

disabled from September 29, 2007 to October 27, 2007 (Tr. 435).  Treatment notes

indicated that she was using a rolling walker at the time of this visit (Tr. 434).

Plaintiff again visited Dr. Lerner on October 29, 2007 (Tr. 433).  Treatment notes

indicate that Plaintiff still used a walker and she received an injection in her back to help

with the pain (Tr. 433).  Her next visit to Dr. Lerner was on November 16, 2007.  She

received a trigger point injection and still used a rolling walker (Tr. 432).  She returned to

Dr. Lerner's office on December 3, 2007 (Tr. 431).  Dr. Lerner prescribed a walker and

listed the diagnosis as Lumbar Myositis, Sciatica and Lumbar Radiculopathy (Tr. 431).

Dr. Lerner wrote Plaintiff a work disability note which stated she was disabled from

November 30, 2007 until January 5, 2008 (Tr. 430).  Plaintiff visited Dr. Lerner's office

again on December 7 and 21 for additional trigger point injections (Tr. 423-25).  On

December 21, Dr. Lerner wrote a note indicating that Plaintiff needed household

assistance from December 21, 2007 to January 18, 2008 (Tr. 424).

On December 28, 2007, Dr. Lerner wrote a work disability note indicating

disability from January 5, 2008 until February 2, 2008 (Tr. 421).  Treating notes from the

December 28 visit indicate that she still used a rolling walker (Tr. 420).  Plaintiff visited

Dr. Lerner about twice per month between January and August 2008, receiving injections

in her back for pain relief on a monthly basis (Tr. 383, 387, 391, 400-02, 405, 409, 410,

413, 415, 417, 418).  Dr. Lerner also wrote work disability notes indicating complete

disability on a monthly basis from February to September, 2008 (Tr. 385, 390, 393, 398,

404, 408, 412, 414). Dr. Lerner also prescribed physical therapy, a lumbosacral corset, and household assistance at various points during that time period (Tr. 382, 386, 394, 395, 399).

Plaintiff visited Philip Mayer, M.D. at his office on December 20, 2007 for an insurance examination when she started having severe back spasms (Tr. 225). Dr. Mayer transferred her to the emergency room at St. Mary Mercy Hospital for treatment (Tr. 225). Hospital treating notes indicate she was ambulatory without difficulty (Tr. 225). After she received pain medicine her condition improved, and her spasmodic movements ceased (Tr. 225-26). She obtained a referral to follow up with her neurosurgeon, Dr. Diaz, and was instructed to return to the emergency room if her symptoms worsened (Tr. 226).

On December 21, 2007, Plaintiff sought emergency treatment at St. John Providence Hospital for severe back pain and spasms (Tr. 572). The report notes there was mild interval improvement in motor exam since the month before, but that her last MRI showed multilevel degenerative changes on the left with disk herniation at several levels (Tr. 573). Dr. Tessy Jenkins, M.D., Plaintiff's neurologist, adjusted her pain medications, swapping Percocet for Vicodin and Carisoprodol for Valium and discharged Plaintiff for outpatient care (Tr. 573).

On December 29, 2007, Plaintiff received an MRI on her right hip and lumbar spine (Tr. 603). R. Sazgari, M.D. reviewed the studies and for the hip MRI, did not see any tearing, but saw a possible minimal surface irregularity of the right acetabular

-10-

labrum,[12] along with tendinosis[13] (Tr. 604).  For the lumbar spine MRI, Dr. Sazgari found

a mild diffuse posterior annular disc bulge at L5-S1, superimposed upon hypertrophic

facet arthropathy (Tr. 606).  Dr. Sazgari also found that the disc material mildly displaces

the descending left S1 nerve root, but without significantly narrowing the central canal

(Tr. 606).  Dr. Sazgari noted that this finding was new since the July 2007 MRI (Tr. 606).

Dr. Sazgari also noted that there were no changes in the degenerative disc and facet

disease (Tr. 606).

Plaintiff next sought emergency treatment for her back pain on May 29, 2008 at

Sinai-Grace Hospital after developing severe lower back pain during a physical therapy

session (Tr. 578).  Makeskumar Patel, M.D., prescribed Valium, Dilaudid, and Naprosyn

(Tr. 579).  Dr. Patel discharged Plaintiff that same day with a prescription for Valium and

instructions to follow up with her primary care physician (Tr. 579).

On June 13, 2008, Plaintiff sought emergency treatment at Henry Ford Medical

Center Fairlane following a motor vehicle accident (Tr. 583).  The report indicates that

Plaintiff was seated in the passenger seat of a van, which a sedan struck on the driver's

side (Tr. 583).  Plaintiff complained of moderate pain in the chest, right hip, and left

---

[12] A fibrocartilaginous rim attached to the margin of the socket of the hip bone. *See* http://www.medilexicon.com/medicaldictionary.php.

[13] Noninflammatory repetitive stress injury of tendon fibers. *See* http://medical-dictionary.thefreedictionary.com/Tendonosis.

shoulder (Tr. 583).  Solomon Knicely, D.O., prescribed Toradol by injection and Vicodin

for pain relief (Tr. 586).  Dr. Knicely also ordered imaging studies of the shoulder, right

hip, and back (Tr. 590-93).  Imaging studies of the right hip showed right pelvic

calicifications, likely vascular, but was otherwise unremarkable (Tr. 590).  Images of the

shoulder showed a small calcific density which Erick Blaudeau, M.D., concluded was

either due to calcific tendonitis or, less likely, a tiny avulsion fracture (Tr. 591).  Imaging

studies of the chest were unremarkable (Tr. 592).  Dr. Knicely discharged Plaintiff the

same day (Tr. 586).

Dr. Lerner's treating notes from June 16, 2008 indicate that Plaintiff was involved

in a motor vehicle accident on June 13, 2008 which further exacerbated her back pain (Tr.

392).  She received another injection on June 16 (Tr. 392).

On August 13, 2008, Dr. Lerner performed a neuromuscular electrodiagnostic

examination (EMG),[14] which showed no evidence of cervical radiculopathy, neuropathy,

or CTS (Tr. 377).

On August 21, 2008, Plaintiff received an MRI of the cervical spine, interpreted by

Ruth G. Ramsey, M.D. (Tr. 601-02).  Dr. Ramsey found no abnormalities (Tr. 602).

On August 14, 2008, Plaintiff visited Botsford Hospital complaining of pain on the

left side of her body and a headache. She was diagnosed with pain in her left arm, back

---

[14] *See* Chemali, Kamal R. and Bryan Tsao, Electrodiagnostic Testing of Nerves
and Muscles: When, Why, and How to Order, 72 Clev. Clinic J. Med. 1 (Jan. 2005)
*available at* http://www.ccjm.org/content/72/1/37.full.pdf. (explaining what a
neuromuscular electrodiagnostic examination consists of)

pain, and sciatica (Tr. 300).  She received Dilaudid while in the emergency room and

discharged with a prescription for Vicodin (Tr. 301).

Plaintiff sought emergency treatment on January 15, 2009 at Botsford Hospital

complaining of headache, sore throat, ear pain, cough, back pain, and left shoulder pain

(Tr. 284).  She was diagnosed with a headache and an ear infection and discharged the

same day with prescriptions for Amoxicillin, ear drops, and Vicodin (Tr. 292).  Plaintiff

visited Dr. Lerner for a consultation on January 19, 2009 (Tr. 352).  Dr. Lerner

determined that she was unable to perform household activities and prescribed household

assistance for one month (Tr. 352).  Her diagnosis was left shoulder tendonitis and

cervical and lumbar radiculopathy (Tr. 353).  Dr. Lerner also prescribed four weeks of

physical therapy, twice per week (Tr. 353).

Plaintiff visited Dr. Lerner again on September 25, 2009 for an examination (Tr.

514).  Dr. Lerner found left shoulder rotator cuff tendinitis, cervical and lumbar myositis,

and left and right sciatica (Tr. 514).  Dr. Lerner prescribed several medications (Tr. 514).

An April 6, 2010 letter to Dr. Lerner indicated that Plaintiff was discharged from

physical therapy due to non-compliance with attendance (Tr. 524).  This again happened

on November 10, 2009 (Tr. 532).

Plaintiff also visited Dr. Jenkins several more times.  A February 3, 2009

neurological exam showed sensory deficits to pin-prick in the right C6-C7, left C5, and

left C8-T1 dermatomes (Tr. 560).  The report noted that motor testing was limited by pain

(Tr. 560).  Dr. Jenkins adjusted Plaintiff's prescriptions (Tr. 560).  A March 3, 2009

neurological exam showed low back tenderness, diminished hearing in the left ear and discharge in the auditory canal, sensory testing intact to pin-prick, antalgic gait but otherwise unremarkable (Tr. 559). Dr. Jenkins gave Plaintiff an antibiotic and ear drops for the ear problem (Tr. 559). An August 27, 2009 neurological exam showed low back tenderness and antalgic gait but was otherwise unremarkable (Tr. 480). A November 23, 2009 EEG report was unremarkable (Tr. 561). A February 3, 2010 neurological exam showed antalgic gait and depressed and anxious affect but was otherwise unremarkable (Tr. 554). The report noted that Plaintiff was experiencing worsening depression with progressive weight gain, hallucinations, and confusion (Tr. 554).

Horizon Treatment Center admitted Plaintiff on November 4, 2009 for outpatient behavioral health treatment (Tr. 487). Plaintiff complained of extreme feelings of depression, hopelessness, and possible suicidal ideation (Tr. 487).

Theresa Carano, M.A., L.P.C., completed a Mental Residual Functional Capacity Questionnaire for Plaintiff on August 16, 2010 (Tr. 614). Ms. Carano, a treating therapist for Plaintiff since November, 2009, listed Plaintiff's diagnosis as Major Depressive Disorder and assigned Plaintiff a Global Assessment of Functioning (GAF) score of 50[15] (Tr. 615). Ms. Carano noted that Plaintiff was unable to meet competitive standards for

---

[15] A GAF score of 41-50 indicates "[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* )(4th ed.2000).

maintaining attention for a two-hour segment, making simple work-related decisions, dealing with normal work stress, taking precautions, and using public transportation (Tr. 617-18). Ms. Carano noted that Plaintiff had no useful ability to function with regard to maintaining regular attendance and punctuality, completing a normal workday without interruptions from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and dealing with the stress of semiskilled and skilled work (Tr. 617-18). Ms. Carano noted that Plaintiff's psychiatric condition exacerbated herexperience of pain (Tr. 618). She also noted that Plaintiff would likely be absent from work more than four days per month due to her psychiatric condition (Tr. 619).

### 2. Non-Treating Sources

On August 5, 2008, Muhammad Mian, M.D., performed a physical residual functional capacity assessment (RFC) (Tr. 444). He listed Plaintiff's primary diagnosis as lumbar radiculopathy and secondary diagnosis as depression (Tr. 444). Dr. Mian opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; that she could stand or walk for a total of 6 hours in an 8-hour workday; that she could sit for a total of 6 hours in an 8-hour workday; and that pushing and pulling were unrestricted (Tr. 445). Dr. Mian limited Plaintiff to occasional climbing, balancing, stooping, kneeling, crouching, and crawling (Tr. 446).

On August 5, 2008, Zahra Khademian, M.D., evaluated Plaintiff for her mental RFC assessment (Tr. 454). Dr. Khademian concluded that although Plaintiff reported a

-15-

chronic history of depression and prior history of psychiatric hospitalization in 1994, she

suffered no exacerbation of any severe depressive symptoms since (Tr. 454). Dr.

Khademian concluded that Plaintiff was mildly depressed but retained adequate mental

ability for a sustained work activity (Tr. 454). Dr. Khademian also noted that Plaintiff

had "some problem with handling stress," but that she was able to make light meals, drive

a car, shop, and manage finances (Tr. 468).

    In July, 2009, Cynthia Shelby-Lane, M.D., performed a consultive examination on

behalf of the Social Security Administration (Tr. 472). The report notes spasms in

Plaintiff's lower back, difficulty ambulating with and without the cane, and an inability to

tandem walk, heel walk, or toe walk (Tr. 472). The report notes that Plaintiff experienced

difficulty standing, stooping and squatting, and that she needed her cane for balance,

support and pain reduction (Tr. 473). However, later in the report Dr. Shelby-Lane

indicated that clinical evidence did not support the need for a walking aid (Tr. 477). The

report indicates that Plaintiff had spasms throughout the exam (Tr. 473). Dr. Shelby-Lane

concluded that Plaintiff had a herniated disc, ongoing paresthesia, along with muscle

spasms, sciatia, depression, anxiety, and vertigo (Tr. 473). Dr. Shelby-Lane also indicated

the need for ongoing mental health care (Tr. 473).

### 3.    Material Submitted After the ALJ's Decision

    Plaintiff began outpatient treatment at Lincoln Behavioral Services on February 8,

2011 (Tr. 623). For the year prior, she received counseling from Horizon Treatment

Center in Southfield (Tr. 623). Her insurance authorization expired so she was referred to

Lincoln (Tr. 623).  According to the intake assessment, Plaintiff's diagnosis was "Major Depressive Disorder - Recurrent" along with a secondary diagnosis of Panic Disorder with Agoraphobia (Tr. 625).

### C.   Vocational Expert Testimony

VE Regan classified Plaintiff's former work as a health care aid as semiskilled and exertionally medium, and her work as a security guard as semiskilled and exertionally light[16] (Tr. 53).  The VE reported that Plaintiff did not acquire any skills that would transfer to a sedentary occupation (Tr. 53).

The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the same age, education and vocational background as those of the claimant and assume that such individual is able to perform light work with the following restrictions: she would be limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling, mentally she would be limited to simple unskilled work with only superficial contact with coworkers, supervisors and the public, and low stress demands.  Would such an individual be able to perform the past relevant work of the claimant?

(Tr. 53-54).

Based on the above limitations, the VE found that Plaintiff would be unable to return to her past work, but could perform the light, unskilled jobs of packer (6,000 jobs

---

[16] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

in the regional economy); sorter (4,000); and inspector (18,000) (Tr. 54).

The ALJ then posed a second hypothetical question:

Please assume a second hypothetical individual of the same age, education and vocational background as those of the claimant and assume that this individual is able to lift a maximum of ten pounds, is never able to climb, balance, stoop, kneel, crouch or crawl, can sit for a maximum of ten minutes at a time, stand for a maximum of ten minutes at a time and only with the assistance of a cane or walker and is able to walk 20 or 30 feet maximum, again only with assistance of a cane or walker, mentally limited to simple work, low stress, superficial contact as stated in the previous hypothetical, but in addition would be likely to take one to two unscheduled breaks per day in addition to the breaks normally provided in a job, and these unscheduled breaks would be due to emotional breakdowns, including crying spells. Would such an individual be able to do any of the past relevant work of the claimant?

(Tr. 54).

Based on the limitations in the second hypothetical, the VE found that Plaintiff would be unable to return to her past work and that there was no competitive employment in significant numbers in the regional economy that such an individual would be able to perform (Tr. 54-55). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* (Tr. 55).

### D.    The ALJ's Decision

Citing Plaintiff's medical records, ALJ Grippo found the severe impairments of "degenerative disc disease, hip and shoulder tendonitis, and affective disorder" but that none of the impairments or combinations of impairments met or medically equaled a Listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 21). He determined that Plaintiff retained the Residual Functional Capacity ("RFC") for light work with some

-18-

exceptions: "claimant is limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and, claimant is limited to low-stress, unskilled work with only superficial contact with coworkers, supervisors, and the public." (Tr. 24).

The ALJ found that Plaintiff was "unable to perform past relevant work" as a health care aid or security guard, which the VE characterized as semi-skilled positions with medium and light exertional levels, respectively (Tr. 30). Adopting the VE's job numbers, the ALJ found that Plaintiff was capable of working as a sorter, a packer, or an inspector (Tr. 31).

The ALJ found Plaintiff's alleged functional deficits "partially credible." (Tr. 28). The ALJ noted that although objective medical evidence supported impairment of the lumbar spine, there were several indicators that Plaintiff was not as limited as alleged (Tr. 28). As to Plaintiff's alleged tremors, the ALJ stated that the medical evidence did not support the nature and extent of Plaintiff's claimed symptoms (Tr. 28). The ALJ gave many reasons to support his discredit of the tremors: treating source physicians were unable to medically determine the cause of such tremors; Plaintiff's clinical presentation of the symptoms was inconsistent in that Plaintiff at times presented to clinical examinations with violent tremors, but other times had no tremor-like symptoms at all; and imaging studies showed no signs in support of tremors to the degree claimed by Plaintiff (Tr. 28). The ALJ also noted that the RFC was consistent with the medical record and that Plaintiff's activities of daily living reflected a greater level of physical and mental functioning than alleged (Tr. 28).

-19-

The ALJ found that Dr. Lerner's opinions were entitled to "little weight," but that the opinions of treating physicians Dr. Claybrooks and Dr. Jenkins were entitled to "favorable weight" (Tr. 29). The ALJ noted that Dr. Claybrooks found no need for surgery, and that Dr. Jenkins "recommended conservative treatment following unremarkable clinical examinations." (Tr. 29). The ALJ also stated that on three of four clinical examinations by Dr. Jenkins over a three-year time span, Plaintiff had full muscle strength, intact sensation, and symmetrical reflexes (Tr. 29).

The ALJ also afforded "great weight" to the opinion of the state agency medical consultant, Dr. Muhammad Mian, M.D. (Tr. 29). The ALJ found Dr. Mian's opinion that Plaintiff could perform light work with postural limitations to be consistent with the medical evidence, and adopted his opinion in formulating the RFC (Tr. 28, 29).

As to the psychological sources, the ALJ gave "limited weight" to the opinion of the state agency psychological consultant, Dr. Zahra Khademian, M.D. (Tr. 29). The ALJ noted that Dr. Khademian opined that Plaintiff can work at all skill levels, yet assessed moderate limitations in daily living, social functioning, and maintaining concentration, persistence, or pace (Tr. 29). The ALJ concluded that Plaintiff was more limited than the assessment of Dr. Khademian (Tr. 29).

Noting that Theresa Carano, M.A. is not an acceptable medical source entitled to controlling weight because she is not a psychiatrist, the ALJ found that her opinion was inconsistent with the record (Tr. 30). The ALJ noted that according to the mental health evidence of record, Plaintiff exhibited a goal-directed thought process with fair judgment,

-20-

insight, and impulse control, as well as normal memory and average intellectual functioning (Tr. 30).  The ALJ nevertheless found Plaintiff's allegations of depression and social isolation "partially credible," thus limiting Plaintiff to low-stress, simple work with only superficial contact with coworkers, supervisors, and the public (Tr. 30).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th  Cir. 1985).  The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

-21-

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; (4) can return to past relevant work; and (5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## ANALYSIS

Plaintiff makes four arguments in favor of remand.[17] First, Plaintiff argues that the ALJ erred in assessing credibility and the RFC, and erred in concluding that Plaintiff is capable of performing substantial gainful employment in violation of SSR 96-8p.

_____

[17] Any issues not raised until objections to this Report and Recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998).

-22-

*Plaintiff's Brief* at 12.  Second, Plaintiff argues that the ALJ gave improper consideration to a non-treating physical examination and did not properly credit the opinions provided by the treating physicians.  *Plaintiff's Brief* at 18.  Third, Plaintiff submits that a Sentence Six remand is appropriate in this case.  *Plaintiff's Brief* at 22.  Fourth, Plaintiff argues that the ALJ improperly failed to address a sit/stand option in the hypothetical question posed to the VE. *Plaintiff's Response* at 1.

### A.      Credibility and the RFC

Plaintiff first argues that in violation of, the ALJ erred in assessing the credibility, in assessing the RFC, and in concluding that Plaintiff is capable of performing substantial gainful employment in violation of SSR 96-12p.  These arguments will be addressed separately.

### 1.      Credibility

In regard to the credibility determination, Plaintiff asserts that the ALJ lacked sufficient evidence to discredit Plaintiff's testimony about her ambulatory limitations and medication side effects.  *Plaintiff's Brief* at 12.

Social Security Ruling 96-7p governs the ALJ's credibility determination.  When determining an individual's credibility, the ALJ must consider the entire record. SSR 96-7p.  This includes (1) the objective medical evidence; (2) the individual's own statements; (3) statements provided by treating or examining physicians; (4) statements provided by other persons about the symptoms; and (5) any other relevant evidence provided by the record. *Id.*  The ruling also notes that a judge may not disregard an individual's

-23-

statements about the intensity and persistence of pain or other symptoms solely because they are not substantiated by objective medical evidence. *Id*. Furthermore, an ALJ must consider all symptoms, including pain, to the extent that the symptoms and pain are consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529.[18]

The ALJ determined that Plaintiff's alleged functional deficits are "partially credible," noting that the plaintiff's "activities of daily living reflect a greater level of physical and mental functioning than alleged." (Tr. 28). This determination is well-substantiated and within the discretion of the ALJ. The ALJ found that although impairment of the lumbar spine was supported by objective medical evidence, the record indicates that Plaintiff was not as functionally limited as alleged (Tr. 28). The ALJ found Plaintiff's allegation of significant tremors not credible, because treating physicians were unable to determine the cause of the tremors and Plaintiff's presentation was inconsistent (Tr. 28). The ALJ also noted that diagnostic studies were unremarkable; he noted an August 21, 2008 MRI which was normal, and a November 23, 2009, EEG which was unremarkable (Tr. 28). The ALJ also pointed out that Dr. Claybrooks noted that it is atypical for someone of Plaintiff's age to have these tremors, which could not be explained from the condition of Plaintiff's spine alone (Tr. 28).

---

[18] The regulation lists factors relevant to symptoms such as pain for an ALJ to consider: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for pain relief; non-medication measures necessary for pain relief such as lying down or standing up; and other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529.

-24-

As to the Plaintiff's daily activities, the ALJ found that her ability to prepare simple meals, drive, leave the home alone, and shop in stores to be inconsistent with her allegations of physical limitation (Tr. 28). The ALJ did take into consideration that Plaintiff requires some assistance managing her personal care (Tr. 28). As to Plaintiff's alleged mental limitations, the ALJ noted that Plaintiff is able to pay bills, count change, handle a savings account, and balance a checkbook (Tr. 28). He also noted that her hobbies of reading the Bible and watching sports on television require more than minimal concentration (Tr. 28). Because the ALJ's credibility determination is thoroughly explained and well-supported, remand on this issue is not warranted.

A credibility determination of a witness or claimant is well within the discretion of an ALJ. "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Accordingly, the ALJ's credibility should not be disturbed.

## 2.      RFC and Ability to Perform Substantial Gainful Activity

Plaintiff argues that the ALJ erred in finding that she was capable of light work. *Plaintiff's Brief* at 12. Specifically, Plaintiff contends that the ALJ never evaluated whether Plaintiff is capable of a competitive work schedule, and that the ALJ only

-25-

selectively listed Plaintiff's abilities when considering her daily activities. *Plaintiff's Brief* at 12-13.

Plaintiff cites Social Security Ruling 96-8p, which states that an ALJ "must discuss" a claimant's ability to perform a full-time work schedule equivalent to 8 hours per day, 5 days per week. Plaintiff states that she took narcotic medications, had severe limitations in the ability to ambulate, had a medically prescribed cane and wheeled walker, and required assistance with getting up from a seated position. *Plaintiff's Brief* at 13. Plaintiff also cites a third-party function report filled out by Plaintiff's sister which, in addition to stating that she is able to prepare simple meals and shop in stores, indicates, among other things that she needs assistance utilizing the toilet, getting into and out of the bath, dressing, going up and down stairs (Tr. 171-172).

The ALJ's RFC assessment is supported by substantial evidence. The ALJ is not required to include discredited testimony or medical opinions into the RFC assessment. The ALJ discredited Dr. Lerner's assessments of disability and partially discredited Plaintiff's testimony (Tr. 28-29). The ALJ was therefore not required to rely on Dr. Lerner's prescriptions of a cane or walker, or his observations in his treating notes that Plaintiff used a wheeled walker (Tr. 420). The ALJ was also not required to rely on Plaintiff's sister's third party function report if he only found it partially credible (Tr. 171-178).

Because the ALJ found that Dr. Mian's opinion that Plaintiff is able to perform light work with postural limitations was consistent with medical evidence in the record,

-26-

he did not err by adopting that RFC assessment.  Furthermore, he noted that Plaintiff's treating physicians, Dr. Claybrooks and Dr. Jenkins, were entitled to "favorable weight," because their opinions were also also consistent with the medical evidence in the record. (Tr. 29).  Becauses substantial evidence  supports the ALJ's RFC assessment, it must be upheld.

### 3.    Step Five Determination

Plaintiff also asserts that the ALJ erred in not including many of Plaintiff's restrictions in the hypothetical scenario presented to the VE. *Plaintiff's Brief* at 15.

A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Comm'r of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).  The Sixth Circuit rejected the proposition that all of a claimant's maladies must be listed verbatim, but "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir. 2004).

ALJ Grippo concluded that treating physician Dr. Lerner's opinion of disability was unreliable, and that Plaintiff's testimony regarding her limitations was only "partially credible." (Tr. 28).  He was therefore not required to include Dr. Lerner's prescriptions of a cane or walker, the allegations of back spasms, or Plaintiff's testimony regarding emotional breakdowns if he did not consider those findings to be credible.  *Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118-19 (6th Cir. 1994) (holding

-27-

that an ALJ is not obliged to include discredited findings in the hypothetical question).

Because substantial evidence supports the ALJ's RFC assessment, and the hypothetical

question included the same limitations as the RFC assessment, the hypothetical question

was proper.

### B.    Deference to treating physician

Plaintiff next claims that the ALJ gave improper consideration to a non-treating

physical examination and failed to give proper deference to the opinion of Plaintiff's

treating physician.

Plaintiff is correct that an uncontradicted, well-supported treating source opinion

"must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)

(citing *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal

quotation marks omitted)).  However, the ALJ found and the record shows that Dr.

Lerner's opinion that Plaintiff is disabled contradicts other evidence in the record (Tr.

29).  The ALJ noted that Dr. Lerner listed one of Plaintiff's diagnoses as cervical

radiculopathy, and continued to list this as a diagnosis following an EMG that specifically

ruled out cervical radiculopathy and neuropathy (Tr. 29).  The ALJ also noted that Dr.

Lerner listed cervical radiculopathy as a diagnosis on an insurance questionnaire

following a motor vehicle accident, which also occurred after the EMG in question (Tr.

29).  The ALJ further pointed out that Plaintiff's daily activities of preparing simple

meals, driving, leaving the home alone, and shopping reflect a greater level of physical

and mental functioning than alleged (Tr. 28).

-28-

Where the treating physician's opinion is contradicted by other, objective evidence in the record, the ALJ may properly reject the opinion of a treating physician so long as the ALJ provides support for that rejection.  *See Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (listing the factors the ALJ must discuss if the opinion of a treating source is not afforded controlling weight); *see also* 20 C.F.R. 1527(d)(2). Plaintiff argues that the ALJ applied an "erroneous legal standard" in dismissing the opinion of the treating physician.[19] *Plaintiff's Brief* at 21.   Although the Plaintiff does not specifically argue that the ALJ failed to apply the appropriate factors[20] in rejecting the treating physician's opinion, it should be noted that the ALJ at least implicitly considered the last three in his analysis.  The ALJ explained his reasoning and pointed to objective evidence in the record – both medical and non-medical –  to conclude that Dr. Lerner's opinion should be afforded "little weight" (Tr. 29).  Furthermore, it should be noted that the ALJ gave favorable weight to two of Plaintiff's other doctors, Dr. Claybrooks and Dr.

---

[19] Plaintiff cites *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987) to support the contention that the ALJ applied an "erroneous legal standard" in rejecting the treating physician's opinion.  Aside from the fact that the ALJ did follow the law in rejecting the treating physician, *see Wilson*, 378 F.3d at 544, *Shelman* is distinguishable.  In that case, the testimony of a non-treating consultative was the basis for rejecting the treating physician.  Here, by contrast, the ALJ pointed to other, objective evidence in the record including medical tests to support his rejection of the treating physician.

[20] In *Wilson*, the court listed factors the ALJ should consider: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544.

-29-

Jenkins (Tr. 29).  Since the ALJ's decision not to give controlling weight to Dr. Lerner's opinion was supported by substantial evidence, it should be upheld.

Plaintiff also argues that the ALJ's decision to give "great weight" to the non-treating, consultative physician Dr. Muhammad Mian, M.D., was unjustified and "patently unfair." *Plaintiff's Brief* at 20-21.  Plaintiff contends that the record gives no indication as to the method Dr. Mian used to determine Plaintiff's abilities to lift, sand or sit, and that Dr. Mian merely reviewed records and never examined Plaintiff. *Plaintiff's Brief* at 20-21. This argument is also without merit.  When an ALJ properly declines to give controlling weight to a treating physician, it is permissible for the ALJ to consider the opinions of other physicians, including non-treating, consultative physicians hired by the SSA.  The ALJ's decision to give "great weight" to Dr. Mian's conclusions that Plaintiff retains the physical capacity to perform light work was reasonable because it was based on a comprehensive review of the medical evidence, and was consistent with the medical evidence of record (Tr. 29).

### C.    Sentence Six Remand

Plaintiff argues that this case should be remanded to the ALJ under the sixth sentence of 42 U.S.C. § 405(g) for consideration of material submitted after the ALJ's opinon. *Plaintiff's Brief* at 22.  In particular, Plaintiff argues that the new evidence presented to the Appeals Council provides further support for a psychiatric disability, because the records indicate a Global Assessment of Functioning of 40. *Id*.

Under sentence six of the controlling statute, a reviewing court may consider

-30-

additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Even if good cause is shown, the records must be material to the Plaintiff's condition at the time of the hearing; if the records show a subsequent deterioration, the proper remedy is a new claim of disability. *Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 712 (6th Cir. 1988) ("Evidence which reflected the applicant's aggravated or deteriorated condition is not relevant because such evidence does not demonstrate the point in time that the disability itself began.") (citing *Oliver v. Sec'y of HHS*, 804 F.2d 964, 966 (6th Cir. 1986)). For new evidence to be material, the proponent of the evidence must show "there was a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.

The record shows that counselors at Lincoln Behavioral Services diagnosed Plaintiff with Major Depressive Disorder and Panic Disorder with Agoraphobia on March 23, 2011 (Tr. 631). The record also indicates that even though a counselor did assign Plaintiff a GAF score of 40 on March 23, 2011, (Tr. 631), a week earlier a physician assigned Plaintiff a GAF score of 48 (Tr. 635).

Even in light of this new evidence, substantial evidence supports the ALJ's RFC assessment. The ALJ concluded that Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04 in 20 CFR Part 404, Subpart P, Appendix 1. When calculating the RFC, the ALJ took into account an "affective disorder," limiting

-31-

Plaintiff to "low-stress, unskilled work with only superficial contact with coworkers, supervisors, and the public." (Tr. 24). Substantial evidence supports the ALJ's determination that although Plaintiff suffered from an "affective disorder," her symptoms did not rise to the level of the impairment necessary to meet the requirements of listing 12.04 in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ noted that Plaintiff could drive, prepare simple meals for herself, and balance a checkbook, and she did not have any episodes of decompensation (Tr. 22). The ALJ also noted that Plaintiff had moderate difficulties in social functioning, which he took into account in the RFC (Tr. 22). Nothing in the new evidence contradicts the ALJ's conclusions about the Plaintiff's ability to function as of the date of the hearing. If Plaintiff is alleging further deterioration of her condition, which the record does not indicate, the proper remedy is to make a new claim for benefits. *Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 712 (6th Cir. 1988).

### D.      Sit/Stand Option

Plaintiff's last argument is contained in her response to the Defendant's Motion for Summary Judgment. Plaintiff argues that the ALJ failed to address the need for a sit/stand restriction in the hypothetical question posed to the VE, even though ambulation restrictions were supported by treating physicians and addressed in the Consultative Examination performed on behalf of the SSA. *Plaintiff's Response* at 1-2. Plaintiff cites 20 CFR § 404.1567, which provides the definition for light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 CFR § 404.1567(b).

Despite Plaintiff's contention that a sit/stand option was required, the evidence actually points to the contrary.  Even though a cane was prescribed and use of a cane was discussed in Dr. Shelby-Lane's consultative examination on behalf of the SSA, other medical records contradict that a cane was necessary.  Dr. Shelby-Lane's report indicated that objective medical evidence did not support the need for a cane (Tr. 477).  Treating notes from St. Mary Mercy Hospital indicated that she was ambulatory without difficulty, even though she had severe back spasms at an insurance examination earlier that day (Tr. 225).  Furthermore, the ALJ found Dr. Lerner's opinions of disability to be not credible, so the ALJ was not required to rely on his assessments of her condition.  Plaintiff's contention that she needs a cane or walker is ambiguous at best, and at worst supports the ALJ's finding that she exaggerated her symptoms.  Because the ALJ's decision not to include a sit/stand option was supported by substantial evidence, it should be upheld.

## CONCLUSION

For the reasons stated above, I recommend  that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Objections to this Report and Recommendation must be filed  within 14 days of

-33-

service as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issues

first raised in objections to a magistrate judge's report and recommendation are deemed

waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific

objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S.

140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505

(6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of

objections which raise some issues but fail to raise others with specificity will not

preserve all the objections a party might have to this Report and Recommendation. *Willis*

*v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Under E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

   Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response. The response shall be not more than 20 pages in

length unless by motion and order such page limit is extended by the court. The response

shall address specifically, and in the same order raised, each issue contained within the

objections.


Dated: July 9, 2013                          S/ R. Steven Whalen
                                             R. STEVEN WHALEN
                                             UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on July 9, 2013, electronically and/or by U.S. mail.

s/Michael Williams
Relief Case Manager for the
Honorable R. Steven Whalen